STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MATTHEW ANTHONY TILLY,
*Defendant-Appellant.*

Washington County Circuit Court
C110526CR; A150219

346 P3d 567

Stephanie J. Hortsch, Deputy Public Defender, argued the cause for appellant. With her on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Karla H. Ferrall, Senior Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

---

* Duncan, P. J., *vice* Edmonds, S. J.

HASELTON, C. J.

**HASELTON, C. J.**

Defendant, who sexually assaulted a resident of the adult foster care facility where he worked, appeals from a judgment of conviction for first-degree rape (Count 2), first-degree sodomy (Count 4), and first-degree sexual abuse (Counts 7 and 8, merged, and Counts 9 and 10, merged). Counts 2, 4, 8, and 10 were based on allegations that the victim, A, was incapable of consent by reason of mental defect. Counts 7 and 9 were based on a forcible compulsion theory. Defendant assigns error to the trial court's denial of his motion for judgment of acquittal (MJOA) on all counts on the grounds that there was insufficient evidence: (1) as to Counts 2, 4, 8, and 10, of A's incapacity to consent; and (2) as to Counts 7 and 9, of forcible compulsion. *See* ORS 163.305(2), (3); ORS 163.315(1); *State v. Marshall*, 350 Or 208, 253 P3d 1017 (2011) (evidentiary standard for forcible compulsion); *State v. Reed*, 339 Or 239, 118 P3d 791 (2005) (evidentiary standard as to incapacity to consent due to mental defect). Because there was sufficient evidence of A's incapacity to consent, the trial court did not err in denying the MJOA as to Counts 2, 4, 8, and 10; conversely, because there was insufficient evidence of forcible compulsion, the trial court erred in denying the MJOA with respect to Counts 7 and 9 and in finding defendant guilty of those charges. We therefore reverse as to Counts 7 and 9, remand for entry of judgment in accordance with this opinion and for resentencing, and otherwise affirm.

In reviewing the denial of an MJOA, we view the facts and reasonable attendant inferences in the light most favorable to the state. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). In accordance with that standard, we summarize the material facts, as amplified and supplemented below.

Defendant worked as a caregiver at a foster care home for adults with mental disabilities from November 2009 until he was fired on January 13, 2011. During that period, A, who was 22 at the time, resided at the facility. She knew the defendant as "Matt" or "Little Matt."

The day after defendant's firing, two other care-givers were discussing his termination in the facility's kitchen. A, who overhead their conversation, entered the room and stated, "I'm glad he's gone." Then she took one of the caregivers by the hand and led the caregiver into her bedroom. A pointed to her television and to her bed, grabbed her breasts and groin area, and said, "Matt touched me." After A and the caregiver left the bedroom, A started crying and wailing and became "hysterical." A few minutes later, A went back into the kitchen and stated, "Penis in my mouth, yuck." At that point, the caregiver contacted her manager, who, in turn, contacted the Washington County Sheriff's Office, which initiated an investigation.

A was interviewed at the Child Abuse Response and Evaluation Services Northwest (CARES) center, which evaluates children and developmentally disabled adults for sexual abuse.[1]

During the interview, A stated that defendant—whom she referred to as "Little Matt"—had hurt her and that he had done so via "sex" and with his "penis." When asked where he hurt her, A pointed to her crotch, and confirmed that defendant put his penis "inside" of that area, and that it felt "awful." Responding to questions about whether defendant hurt her anywhere else, A said that his "penis" hurt her "butt," pointed to her mouth and said "yucky," and, when asked what his penis tasted like, replied, again, "yucky." She also indicated that he had touched her breast with his mouth and hands.

In response to questions about where and how the alleged abuse occurred and whether defendant said anything to her about "telling," A disclosed that the abuse took place in her room, on her bed, that everyone else was "gone," and that it happened "lots." She indicated that defendant undid her zipper and took her pants off. She said that "Little Matt" told her, "I can't tell." Further, when asked, "Does anybody have secrets," A replied, after a pause, "Little Matt does."

---

[1] Because we discuss that interview in detail below in analyzing the evidence of A's capacity to consent, 269 Or App at 674-77, we present only a brief summary of her statements here.

Several days later, detectives interviewed defendant at his home. Eventually, defendant admitted to a single "consensual" sexual encounter with A involving him touching A's genital area over her clothes and receiving a "handjob." Defendant, who insisted that A had been the aggressor, repeatedly stated that he "felt guilty" about what had happened, and, at one point, expressed his belief that A was incapable of understanding what had happened between them.

Defendant was charged with various sex offenses, including first-degree rape, ORS 163.375 (Counts 1 and 2),[2] first-degree sodomy, ORS 163.405 (Counts 3 to 6),[3] and first-degree sexual abuse, ORS 163.427 (Counts 7 to 10).[4] The state brought two counts for each factual episode, alleging that defendant had committed Counts 1, 3, 5, 7, and 9 through "forcible compulsion" of A and, correspondingly, in Counts 2, 4, 6, 8, and 10, that defendant had engaged in the conduct with a person "incapable of consent by reason of mental defect."

Defendant opted for a bench trial, at which the court heard testimony from various witnesses, including A. The state played a video of the CARES interview for the court, as well as portions of defendant's interview with the detectives. At the close of the state's case, defendant moved for a judgment of acquittal on all counts, arguing that the state had failed to prove (as applicable) the forcible compulsion and mental defect elements of the various crimes.

The trial court denied that motion in its entirety. With respect to the sufficiency of proof of forcible compulsion,

[2] ORS 163.375(1) provides, in relevant part, that a person who has sexual intercourse with another person commits the crime of first-degree rape if the victim "is subjected to forcible compulsion" or, alternatively, if the victim "is incapable of consent by reason of mental defect."

[3] Counts 3 and 4 alleged that defendant "plac[ed] his penis in contact with [A's] mouth." Counts 5 and 6 alleged that he "plac[ed] his penis in contact with [A's] anus."

ORS 163.405(1) provides, in relevant part, that a person who engages in "deviate sexual intercourse with another person or causes another to engage in deviate sexual intercourse" commits the crime of first-degree sodomy if the victim "is subjected to forcible compulsion by the actor" or "is incapable of consent by reason of mental defect."

[4] Counts 7 and 8 were based on allegations of defendant "touching [A's] breasts" and Counts 9 and 10 alleged that he "caus[ed A] to touch * * * [his] penis."

the court took into account the allegations as to A's disability, defendant's status as her care provider, and the incident occurring in her bedroom so that there was "no place * * * for her to retreat."

With respect to the mental defect issue, the trial court, while observing that it "would have clearly preferred that the State put on evidence by some sort of expert," concluded that such evidence was not necessarily required and that there was sufficient evidence that A had a mental condition that rendered her "incapable of consent to the conduct in question." In that regard, the court specifically referred to the CARES interview and testimony that A lived in a facility that provided "24/7 care" for people with developmental disabilities who "just cannot take care of themselves on their own."

Ultimately, the trial court found defendant guilty of Counts 2, 4, 8, and 10 (requiring proof of incapacity to consent) and Counts 7 and 9 (requiring proof of forcible compulsion), and not guilty on Counts 1, 3, 5, and 6. The judgment of conviction merged Counts 7 and 9, respectively, with Counts 8 and 10, but otherwise reflected the verdict.

On appeal, defendant challenges the denial of the MJOA, arguing, as he did before the trial court, that the state failed to provide sufficient evidence of forcible compulsion and of A's lack of capacity to consent. We review that denial to determine whether there was legally sufficient evidence from which a rational trier of fact could have found the essential elements of each crime proved beyond a reasonable doubt. *Cunningham*, 320 Or at 63.

## INCAPACITY TO CONSENT

As noted above, defendant was convicted on Counts 2, 4, 8, and 10, which were based on A's incapacity to consent to certain sexual acts "by reason of mental defect," *see* ORS 163.375(1) (first-degree rape); ORS 163.405(1) (first-degree sodomy); ORS 163.427(1) (first-degree sexual abuse); ORS 163.315(1) ("incapacity" statute), and challenges those convictions on the ground that the evidence did not demonstrate that A's mental condition rendered her incapable of consenting to the sexual acts.

We begin with a brief overview of the statutory scheme, including the meaning of, and relationship between, the archaic (and, to contemporary sensibility, offensive) terms "mental defect" and "mentally defective person." ORS 163.315(1) provides that "[a] person is considered incapable of consenting to a sexual act if the person is * * * [m]entally defective."[5] ORS 163.305(3), in turn, defines "mentally defective" as follows:

> "'Mentally defective' means that a person suffers from a mental disease or defect that renders the person incapable of appraising the nature of the conduct of the person."[6]

Thus—and somewhat confusingly—a person with a "mental defect" is not necessarily "mentally defective" for purposes of the requisite incapability to consent. Rather, the "mental defect" (a term that is *not* statutorily defined) must also render "the person incapable of appraising the nature of [the person's] conduct."[7]

---

[5] ORS 163.315(1) also provides that persons who are "under 18 years of age," "mentally incapacitated," or "physically helpless" are incapable of consenting to sexual acts. ORS 163.305(4) defines "mentally incapacitated" (as opposed to "mentally defective") as meaning that "a person is rendered incapable of appraising or controlling the conduct of the person at the time of the alleged offense."

[6] The statutory definition of "mentally defective" and related sex offense statutes were adopted as part of the 1971 Oregon Criminal Code and were modeled after the Michigan Revised Criminal Code and the New York Revised Criminal Code. The legislative history states that the term "mentally defective" and its definition were based on "the language of contemporary psychiatry." Commentary to Criminal Law Revision Proposed Oregon Criminal Code, Final Draft and Report §§ 104 - 113 (July 1970).

Since 1971, both Michigan and New York have, to varying degrees, revised their statutes concerning the capacity of mentally disabled persons to consent to sexual activity, replacing "mentally defective" with "mentally disabled." 2000 Mich. Legis. Serv. 505 (West); 2000 N.Y. Sess. Law Ch. 1 (S. 8238, A. 11538) (McKinney); *see* Mich. Comp. Laws Ann. §§ 750.520a(i) & (j) (West) (defining "mentally disabled" as meaning "that a person has a mental illness, is intellectually disabled, or has a developmental disability"; defining "mentally incapable" as meaning "that a person suffers from a mental disease or defect that renders that person temporarily or permanently incapable of appraising the nature of his or her conduct"); N.Y. Penal Law § 130.00[5] ("'Mentally disabled' means that a person suffers from a mental disease or defect which renders him or her incapable of appraising the nature of his or her conduct.").

[7] The confusion is exacerbated by the fact that, although ORS 163.315(1)(b) uses the term "mentally defective," the statutes defining the elements of the sexual offenses refer to "mental defect," not "mentally defective." *See, e.g.,* ORS 163.375(1)(d) ("[t]he victim is incapable of consent by reason of mental defect").

In *Reed*, the Oregon Supreme Court explored that statutory scheme—and, particularly, amplified the definition of "mentally defective" in ORS 163.305(3)—under the methodology prescribed by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993). The court's majority opinion, based on a purely textual review, referred to the common meaning of such terms as "incapable"—*viz.*, "lacking capacity, ability, * * * qualification for the purpose or end in view," and "appraise"—*viz.*, to "judge and analyze * * * worth, significance or status." *Reed*, 339 Or at 244 (quoting *Webster's Third New Int'l Dictionary* 105, 1141 (unabridged ed 2002). The court explained that ORS 163.305(3)

> "refers to a mental defect that prevents one from appraising the nature of one's own conduct. The 'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct. * * * [W]e view that standard in the context of interactions with other persons, such as offers and proposals from other persons to engage in certain kinds of conduct."

*Reed*, 339 Or at 244. Consistently with that understanding, the court further explained that the statutory scheme "does not support the notion that a person who has a mental disability is necessarily incapable of consenting to sexual relations under any circumstances." *Id.* Rather, under certain circumstances, "a person who can understand that another person has initiated some kind of sexual activity with that person may be capable of appraising the nature of the conduct and, thus, may be capable of consenting to a sexual act." *Id.*

The majority opinion proceeded to address whether the state had adduced proof that, "at the time of the alleged crimes, the victim had a mental defect and that that mental defect rendered [the victim] incapable of consent," *id.* at 245, ultimately concluding that the state had failed to offer evidence demonstrating "the necessary link," the nexus, between the victim's mental condition and her incapacity to "appraise the nature of the sexual conduct," *id.* at 246-47. In so concluding, the majority emphasized that, although the state had presented some generalized testimony from an expert, constituting a "summary description of the victim's

mental deficiency," *id.* at 246, that witness's testimony (while perhaps having "some bearing on the victim's qualifications to manage money or to participate in the work force") did not, "either directly or by permissible inference," pertain to the victim's "understanding of sexual relations or her ability to make choices about having sexual relations with others," *id.* at 247.

Justice Kistler, joined by Justice Balmer, dissented, endorsing the majority's interpretation of ORS 163.305(3), but disagreeing that the evidence was legally insufficient to permit a reasonable juror to find the requisite incapacity to consent. That separate opinion's thoughtful explication of the statute, which is in no way inconsistent with the majority's construction, also informs our analysis:

> "The question is whether a reasonable juror also could find that [the victim's] condition rendered her 'incapable of appraising the nature of [her] conduct.' As the majority recognizes, that question entails two issues. The first is what the phrase 'incapable of appraising the nature of the conduct' means. On that issue, I agree with the majority that the word 'appraising' is key to understanding the meaning of the quoted phrase. As the majority notes, the word 'appraise' means 'to judge and analyze the worth, significance or status of.' *Webster's Third New Int'l Dictionary* 105 (unabridged ed 2002). Thus, the question whether a person lacks the capacity to consent by reason of mental defect turns on whether the person is capable of judging or analyzing the worth, significance, or socially accepted status of engaging in particular sexual activity. Put another way, the question is whether the person is capable of assessing the personal and social consequences of his or her decision to engage in that activity."

*Id.* at 248-49; *see also id.* at 251-52 (observing that appraising sexual conduct entails "mak[ing] judgments about the complex personal and social issues that surround decisions regarding sexual activity").

We return to this case. Here, as in *Reed,* there is no dispute that A's cognitive impairment is so substantial as to constitute a "mental defect." Rather, the parties' disagreement centers around whether there was sufficient evidence that A's cognitive impairment rendered her incapable

of appraising the nature of her conduct, such that she lacked the capacity to consent to the sexual activity. In other words, the issue is whether the state provided evidence that would allow a rational trier of fact to determine that A met the statutory definition for "mentally defective."[8] We conclude that the state adduced legally sufficient evidence. Before amplifying that conclusion, we recount the predicate proof, which consists of: (1) evidence of general circumstances pertaining to A's disability; (2) the CARES interview; (3) A's testimony at trial; and (4) defendant's inculpatory admissions, based on his observations and interaction with A, relating to her ability to appreciate the nature of sexual conduct.

1. *General circumstances*

During the trial, the state presented evidence about A's disability. Several witnesses testified about the care provided at the group home. Defendant's former coworker testified that the facility is a "residential home" for "developmentally disabled individuals." She also stated that, during defendant's employment, three clients, including A, resided there, and that, generally, two caregivers were on duty at any given time. The facility's manager testified that his company operated "24-hour" group homes "for people with disabilities."

2. *The CARES interview*

In addition to the other evidence, the state presented the recording of A's CARES interview as part of its case in chief. We note that, during oral argument, both parties urged this court to view the interview, which we describe in detail.

At the outset, CARES counselor Jennifer Wheeler and A entered the room and sat at a table facing an observation window. A was holding a stuffed animal (a toy bunny) which she clutched or held in her lap throughout the 35-minute interview. She smiled, initially, at Wheeler. A box of markers and a page from a coloring book were on the table, and A immediately selected a marker and started coloring.

---

[8] Although defendant notes, not unreasonably, that the state did not call a medical expert to testify about A's condition, defendant acknowledges that there was sufficient evidence that A had a "mental defect."

Wheeler explained that they were recording the talk, and asked A if she had any questions. After a long pause, A—no longer smiling—turned to Wheeler and said, "Little Matt." Wheeler repeated A's words, and A said it again, more decisively: "Little Matt."

Then Wheeler gently asked, "What about Little Matt?" Gesturing with the marker, A responded: "Sex me." Wheeler—who evidently interpreted that statement as "sucks," rather than "sex"—softly repeated what she thought A had said: "Sucks you?" "No," A said. Then she pointed in between her legs, and stated, "Sex. Penis."[9]

Wheeler asked who Little Matt was. A stopped coloring, looked directly at Wheeler, and started to answer, but then said, "Um." A paused for several moments and then, without answering the question, turned back to her coloring. Wheeler tried a different approach: "Where do you see Little Matt?" A responded immediately: "At my house sometimes." Wheeler then asked if A could "tell [her] more about what Little Matt does." There was another long pause. A, looking downward and rolling her marker back and forth on the table, said "um."

Wheeler changed the subject, asking "What's your full name?" A's response was unintelligible and did not sound like her name. Wheeler then asked A what her "first name" was and, after that question failed to elicit any response, suggested to A, "You're [A's first name]," to which A replied, "Ya." After Wheeler asked, A stated her age ("22") and wrote down her first name. She did so in painstaking fashion, like a child who is first learning to write. When Wheeler then asked A where she lived, A did not answer; she said "um" and rubbed her forehead and face. Then Wheeler said, "I forgot to tell you this, but if you don't know the answer—" and A interrupted, "I don't know."

A few moments later, Wheeler asked A if she remembered Wheeler's name, and A indicated that she did not, so Wheeler said, "I'm Jennifer, you can call me Jennifer."

---

[9] This misunderstanding arose again, a few minutes later, when Wheeler asked A to tell her more about what she had said earlier: "Who sucks, who does the sucking?" At that point A set her marker down, looked right at Wheeler, and put her head down on the table, visibly distraught.

A nodded. At that point, A seemed to be getting upset. Wheeler asked her how she was doing that day, and she replied, "Fine, tired." Following up, Wheeler asked, "What makes you tired?" A replied, "Not sleep well night" and went back to coloring. Then Wheeler asked, "How come?" but A did not respond, so Wheeler took a different tack: "Are you worried about anything?" "Little Matt," A replied. At that point, Wheeler tried several times to get A to elaborate. Eventually, A, who had begun coloring furiously, confirmed that she was worried about "Little Matt" and "sex." Wheeler asked, "What is sex?" A, still coloring, slowly said, "Sex... is...," but did not finish.

The 35-minute conversation continued in that manner, with Wheeler gently posing questions and A visibly struggling to answer even the most basic questions. More often than not, Wheeler's simple but open-ended questions elicited incomplete or unintelligible responses, or none at all.[10] Sometimes a halting answer came after Wheeler repeated or rephrased a question.[11] There were many long pauses where A focused on Wheeler and appeared to be contemplating a question. Other times, she simply withdrew, looking away or coloring intently. A frequently communicated nonverbally, gesturing with her hands, nodding or shaking her head, or through eye contact (or lack thereof). In many instances, she told Wheeler that she did not know the answer or did not want to answer.[12] Those patterns were apparent throughout the interview, and, although A appeared to be more upset—indeed, traumatized—when

---

[10] For instance, after A pointed to her crotch (indicating that defendant had put his penis inside of her vagina), Wheeler asked her, "What do you call that part?" and suggested some possible answers. A, clasping her stuffed animal, stared at Wheeler, but said nothing, and then shook her head. Wheeler continued, "What do you use that part of your body for?" A looked down and did not answer.

[11] On occasions, on neutral matters, such as A's first name, Wheeler would ask a "close-ended" question.

[12] For example, when Wheeler asked whether defendant had touched her breast "on the skin or on top of clothes," A sunk into her chair, shoulders hunched, and, her voice cracking, said, "I don't know," and put her thumb in her mouth for a moment. Later, after she was asked if anything came out of Little Matt's penis, A replied "yellow." But when Wheeler pressed for more information, A was unwilling to answer. "Don't wanna say it," the victim responded, and twice repeated.

Wheeler asked about "Little Matt," the same dynamic was evident in A's responses to simple personal questions.[13]

Based on the CARES interview recording, an objectively reasonable viewer could find—indeed, we dare say, given our own review of the recording, would find—that A's affect, demeanor, conduct, and statements throughout the interview were characteristic of a young, preschool aged child. When asked what was her favorite TV show, she responded, "Sponge Bob"; as noted, she kept her stuffed bunny in her lap throughout the interview, sometimes clutching it when she was distressed. When the interview was drawing to a close, A gave her not-quite-completed coloring sheet (a pink cat) and her paper cup to Wheeler. Those manifestations of distinctly childlike behavior exemplified A's conduct during the interview, the totality of which was unaffected, simple, and childlike.

### 3. *A's testimony*

In her testimony at trial, A repeatedly (in response to unchallenged leading questions from both parties) expressed the view that "Little Matt" was "mean" and "ugly." A conveyed that she disliked defendant due to the sexual abuse that he had subjected her to, that she had liked him before the abuse took place, and that she was glad that he was gone. In describing what had happened, A, after pointing to her crotch, stated that he had put his penis "inside." She also indicated that he had touched her chest area. When asked whether that touching was "okay," A replied "No."

On cross-examination, defense counsel asked A a series of questions about relationships, marriage, and "how *** people get babies." That line of questioning resulted in the following colloquy, which, given its subject matter, is particularly relevant to the question of whether A lacked the capacity to consent to sexual activity:

"Q. *** [D]o you understand what it means to get married?

---

[13] A told Wheeler that her favorite food was "hamburgers" but could not say her favorite place to get one. She also told Wheeler that she saw her boyfriend "at work" (although she was not able to say where she worked or what her job was) and that she liked him because "he loves me."

"A. I don't.

"Q. Well, I'm not asking for the whole thing, but you know—if I say, 'I'm married'—okay, what does that mean to you?

"A. Married, babies. Married.

"Q. Yeah. When you're saying married you're—

"A. Yeah, ring—

"Q. Yeah, what's that?

"A. Ring.

"Q. For marriage, yeah. So what does that mean?

"A. Ring.

"Q. So that means—right, that—

"A. Married.

"* * * * *

"Q. Yeah. Okay. So now let's—this is going be a question that's going to sound like maybe we're in a health class or something, okay? But can you deal with this?

"A. Yeah.

"Q. All right. If there's a husband and a wife, all right, and they had kids—

"A. Yeah.

"Q. I mean, it—at your age, you know how they get the kids right?

"A. Stomach.

"Q. Hum?

"A. Stomach. Babies.

"Q. Right. Well, how do people get babies?

"A. Stomach.

"Q. In their stomachs, right.

"A. Yeah.

"Q. Well, what do you do before you get the baby in your stomach?

"A.   Sex.

"Q.   I'm sorry?

"A.   Sex.

"Q.   Oh, okay. So then—I mean, you know about that.

"A.   Yeah.

"Q.   How old are you? Twenty-three? Twenty-three?

"A.   (No audible response.)

"Q.   Okay. So in order to have a baby—

"A.   Yeah.

"Q.   In order for the wife to have a baby in her stomach, she and her husband have to have sex?

"A.   Yeah.

"* * * * *

"Q.   Okay. So are you getting married some day?

"A.   Not yet.

"Q.   No. You want that?

"A.   My boyfriend—call me no more.

"Q.   Oh, I'm sorry to hear that. I can see, it's hard to get married if your boyfriend doesn't call you.

"A.   Yeah.

"Q.   Well, let's say you find the right boyfriend, okay?

"A.   Yeah.

"Q.   Someday you'll find the right boyfriend, he calls you back. Would you like to get married some day?

"A.   Yeah. New one.

"Q.   Yeah?

"A.   Yeah.

"* * * * *

"Q.   What would you—what would that be like for you?

"A.   Married. Wedding.

"Q.   Yeah. Anything else?

"A.   No.

"Q.   Okay. I mean, you understand what marriage is about, right?

"A.   Yeah."

### 4.   *Defendant's admissions*

The state introduced portions of defendant's interview with detectives into evidence, including an excerpt in which defendant conveys his belief that A was incapable of understanding sexual relations. Specifically, when one of the detectives alluded to A's disability and her inability to understand sexual relations, defendant agreed that A was not capable of understanding such matters.

### 5.   *Analysis*

Given the totality of that evidence—the intensive, "24/7" nature of the care that A received and the 2:3 caregiver to resident ratio at the group home; A's behavior, demeanor, and statements during the CARES interview; A's testimony at trial bearing on her appreciation of matters of a sexual nature; and defendant's acknowledgment, based on his observation and experiences working with A for a year, that she was not capable of understanding sexual matters—a rational trier of fact could determine that A's mental disability rendered her incapable of appraising the nature of her conduct during the events in question and, therefore, incapable of consenting to the sexual activity.

Based on that evidence, a trier of fact could reasonably infer that A's cognitive disability not only substantially impaired her ability to comprehend and respond coherently to simple questions, but also—critically here—that it severely limited her understanding of relationships and social interactions, including those of a sexual nature. A's statements and limited ability to answer many simple questions relating to the abuse, sexual activity, and her body demonstrated that her grasp of such matters was, at most, rudimentary, and would permit a rational trier of fact to conclude that she lacked the capability to appraise her conduct under the circumstances. Indeed, A—who was questioned at length about those topics—displayed, at most, a simplistic

understanding of sex and the body, and a childlike approach to relationships.

Defendant argues, however, that A's statements show that she was "aware of the sexual nature of the conduct" and "that she had the ability to resist [his] advances." It is true that A was able to report and describe the abuse, that she identified some of defendant's conduct as "sex," and that, after the abuse took place, she expressed disgust with defendant as well as upset over the alleged abuse. However, as amplified in *Reed*, our review focuses on whether a reasonable trier of fact could conclude that A's mental disability rendered her incapable of appraising her own conduct, including the potential personal and social consequences of the sexual activity, during the events in question. To be sure, A's statements that defendant emphasizes are probative of whether she lacked the requisite inability to consent; however, they are not categorically legally conclusive of A's capacity to consent. Rather, based on the totality of the evidence, a reasonable trier of fact could infer that, at the time of the events in question, that she was not able to "appraise" her conduct, that she did not understand what was going on, and that she was unable to control the situation—which is why she was so vulnerable.

Finally, we emphasize that this case is materially and factually distinctive from *Reed*. There, as noted, *see* 269 Or App at 672, the Supreme Court majority's conclusion regarding the insufficiency of the state's proof emphasized the distinction between generalized proof of mental disability and proof pertaining to the complainant's requisite, particularized inability to understand or consent to sexual relations. 339 Or at 247. Because the state had adduced only the former, without the latter, its proof was legally insufficient.

Here, by contrast, there was significant evidence that bore upon A's understanding of sexual relations. A's testimony at trial almost exclusively related to her understanding of sexuality and romantic relationships, as did sizeable portions of the CARES interview. Moreover, the interview allowed the trier of fact not only to consider A's responses, but also afforded the opportunity to observe, at length, the outward manifestations of her mental disability.

Finally, here, unlike in *Reed*, the state presented evidence of defendant's admission that A was unable to understand what had happened. That evidence further supports our conclusion. *See State v. Barteaux*, 212 Or App 118, 123, 157 P3d 225, *rev den*, 343 Or 160 (2007) (the defendant's view that the victim was unable to understand sexual relations "support[s an] inference that the victim did not understand that she could choose whether to engage in sexual relations with [the] defendant," demonstrating, with other evidence, the necessary link between the victim's mental condition and her incapacity to consent).

The trial court did not err in denying the MJOA with respect to Counts 2, 4, 8, and 10.

## FORCIBLE COMPULSION

We turn to defendant's challenge to the sufficiency of the state's proof that he committed first-degree sexual abuse "by means of forcible compulsion" (Counts 7 and 9). Although those charges were merged with the convictions on Counts 8 and 10, which we have affirmed, our disposition in that regard does not obviate the need to address the denial of the MJOA with respect to those charges. *See State v. Link*, 346 Or 187, 208 P3d 936 (2009) (where two charges are merged into a single conviction and there is sufficient evidence of one charge but insufficient evidence of the other, the error is not harmless, because the defendant is entitled to a judgment that reflects the correct determination of the charges in the indictment).

ORS 163.427(1) provides, in relevant part, that a person who subjects another person to sexual contact commits the crime of first-degree sexual abuse when the victim "is subjected to forcible compulsion by the actor." In the context of this case, to prove the element of forcible compulsion, the state was required to establish that defendant employed "physical force" that "compelled the victim to submit to or engage in the [sexual] contact." *Marshall*, 350 Or at 227; *see* ORS 163.305(2)(a).[14] In other words, there must be

---

[14] Alternatively, forcible compulsion can be achieved via threat of physical injury or kidnapping, a variant of the crime not at issue here. ORS 163.305(2)(b). The state does not contend that defendant's conduct violated that provision.

a "causal connection" between the forcible compulsion and the specific sexual contact at issue. *Marshall*, 350 Or at 227. Furthermore, the state must show that the physical force used "was greater in degree or different in kind from the simple movement and contact that is inherent in the act of touching the intimate part of another and that the force was sufficient to compel the victim to submit to or engage in the sexual contact, against the victim's will." *Id.*

*Marshall* is exemplary. There, the Oregon Supreme Court evaluated the sufficiency of the evidence against a defendant who had been convicted on two counts of first-degree sexual abuse, in connection with the following events:

"Defendant, who was 27 at the time, was a friend of the [14-year-old] victim's mother and had been living with the victim's family for a short time. Early in the morning on the day in question, the victim woke up and discovered defendant in her bed, partially on top of her, hugging her and trying to kiss her. The victim told him 'no' and tried to push him away. Defendant began to rub the victim's back, with his hand outside her t-shirt. The victim was 'a little bit' scared and wondered what defendant was doing. Defendant continued to rub the victim's back for 10 or 15 minutes and then took the victim's hand and held it on the bed between the victim and himself. Defendant asked the victim about her 'last boyfriend' and about whether she wanted him to help her 'get over her fears.' The victim responded 'no.' Defendant then 'grabbed' the victim's hand and 'forced' it down the front of his pants, placing it on his erect penis. After a few seconds, the victim 'jerked' her hand away, turned onto her stomach, and faced away from defendant.

"Defendant began rubbing the victim's back again, this time with his hand underneath her shirt. Ultimately, he slipped his hand down the back of her sweatpants and put it on her buttocks. The victim said 'no' and scooted away from defendant. Defendant pulled his hand away."

350 Or at 212-13. Based on those events, the state alleged, first, that the defendant had forcibly compelled the victim to touch his penis and, second, that he had touched the victim's buttocks by means of forcible compulsion.

The Supreme Court in *Marshall* affirmed the first count, concluding that the evidence—that the defendant

had forced the victim's hand down his pants and against his penis, and that the victim had pulled her hand away—was sufficient, because the defendant's "use of his own hands to cause the victim to engage in that sexual contact" constituted physical force "different in degree or kind from the simple movement and contact inherent in the act of the victim touching [the] defendant's penis." *Id.* at 227-28.

With respect to the second charge, however, "the court reached the opposite conclusion. It explained that, "[i]n contrast to the physical force * * * used to cause the victim's hand to come into contact with [the defendant's] penis, nothing in the record suggests that the second touching itself involved any greater or different force than was inherent in that particular sexual contact—[the] defendant's touching of the victim's buttocks." *Id.* at 228. Although the court acknowledged that the victim "did not consent to the touching" and that there were "*other* prior acts involving physical force," the defendant did not "exert[] any physical force other than that involved in briefly touching the victim's buttocks," and there was no evidence of an act of physical force that could have compelled the victim to submit to that particular contact. *Id.* at 228-29 (emphasis in original).

In this case, the state was required to prove, as to Count 7, that defendant used physical force to compel A to submit to his touching of her breasts. The evidence of that touching derived from the CARES interview, in which A conveyed that defendant touched her breasts with his hands and his mouth, but said nothing about defendant using physical force in the course of that touching.[15] Specifically, there was no evidence that defendant used "greater or different force than was inherent in" touching A's breasts. *Id.* at 228.

Likewise, as to Count 9, the state was required to prove that defendant used physical force to cause A to touch his penis. That charge was not based on any statement by A—but, instead, was based on defendant's statement to detectives that he had permitted A (whom he painted as the aggressor) to touch his penis. There was no evidence that

---

[15] As we discuss above, *see* 269 Or App at 674-80, A's ability to describe the sexual abuse was extremely limited, so that she was incapable of providing a narrative as to any particular event.

defendant employed physical force to cause A to engage in that conduct.

Thus, the state failed to establish the requisite nexus under *Marshall* between any use of forcible compulsion and the predicate sexual acts for both first-degree sexual abuse charges.[16] Accordingly, the trial court erred in denying the MJOA on both Counts 7 and 9, and, notwithstanding the merger of those charges with defendant's convictions on Counts 8 and 10, the judgment must be modified to reflect an acquittal on Counts 7 and 9 and convictions on Counts 8 and 10. *Link*, 346 Or 187.

Reversed as to Counts 7 and 9; remanded for resentencing; otherwise affirmed.

---

[16] In the CARES interview, the victim conveyed that defendant held her arms down while he was doing "sex" and that it made it hard for her to breathe because she was "angry." Notwithstanding that testimony, the trial court acquitted defendant on the "forcible compulsion"-based first-degree rape charge (Count 1), while convicting him on the corresponding "lack of capacity"-based charge (Count 2).