Argued and submitted February 9, 2021; Counts 2 through 5 reversed, remanded for resentencing, otherwise affirmed September 14, 2022

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

CHANCE NEAL WALLACE,
*Defendant-Appellant.*

Jackson County Circuit Court
17CR27381; A170354

517 P3d 323

Defendant appeals his conviction of rape in the first degree based on forcible compulsion, as well as a guilty verdict of rape in the first degree and convictions of two counts of sodomy in the first degree and one count of sexual abuse in the first degree based on the victim's inability to consent by reason of mental defect. Defendant challenges the trial court's denial of his motion for mistrial on all the counts based on his contention that the trial court erroneously admitted testimony that implicated his right to remain silent. He also challenges the court's submission to the jury of the counts that were based on the victim's inability to consent to the alleged sexual conduct, contending that the trial court erred in denying his motion for a judgment of acquittal on those counts based on the state's failure to prove that the victim did not have the ability to consent. *Held*: The Court of Appeals rejected defendant's contention that he was entitled to a mistrial, concluding that the challenged testimony was not a comment on defendant's right to remain silent. But the court agreed with defendant that the evidence in the record is not sufficient to establish the state's burden to show that the victim lacked the ability to consent to sexual activity due to her mental disability. The trial court therefore erred in denying defendant's motion for judgment of acquittal on the counts that were dependent on proof of that element.

Counts 2 through 5 reversed; remanded for resentencing; otherwise affirmed.

Lorenzo A. Mejia, Judge.

Shawn Wiley, Deputy Public Defender, argued the cause for appellant. Also on the opening brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services. Chance Neal Wallace filed the supplemental brief *pro se*.

Kirsten M. Naito, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Mooney, Presiding Judge, and Egan, Judge, and Pagán, Judge.*

EGAN, J.

Counts 2 through 5 reversed; remanded for resentencing; otherwise affirmed.

Mooney, P. J., concurring and dissenting.

_____

\* Egan, J., *vice* DeVore, S. J.; Pagán, J., *vice* DeHoog, J. pro tempore.

**EGAN, J.**

Defendant appeals from a judgment of conviction of rape in the first degree, ORS 163.375 (2015), *amended by* Or Laws 2021, ch 82, § 4 (Counts 1 and 2),[1] two counts of sodomy in the first degree, ORS 163.405 (2015), *amended by* Or Laws 2021, ch 82, § 5 (Counts 3 and 4), and one count of sexual abuse in the first degree, ORS 163.427 (2015), *amended by* Or Laws 2021, ch 82, § 7 (Count 5). Under the statutes defining the offenses, they are committed if the victim "is subjected to forcible compulsion," ORS 163.375(1)(a) (2015), or, alternatively, if the victim "is incapable of consent by reason of mental defect" ORS 163.375(1)(d) (2015), or by reason of "being mentally defective." ORS 163.427(1)(a)(C) (2015).[2] The guilty verdict on Count 1 was based on forceable compulsion, and the guilty verdicts on Counts 2 through 5 were based on the victim's inability to consent. Defendant challenges the trial court's denial of his motion for mistrial on all the counts. He also challenges the court's submission to the jury of Counts 2 through 5, which were based on the victim's inability to consent to the alleged sexual conduct, contending that the trial court erred in denying his motion for a judgment of acquittal (MJOA) on those counts based on the state's failure to prove that the victim did not have the ability to consent.

We have considered and reject without discussion the arguments raised by defendant in his *pro se* supplemental brief. As discussed in more detail below, however, we conclude that some of the assignments of error in defendant's opening brief are well taken and require a reversal of the guilty verdict on Counts 2 and the convictions on Counts 3 through 5.

We first address defendant's fifth assignment of error, which relates to all the counts, and in which he contends

---

[1] The guilty verdict on Count 2 was merged into a single conviction on Count 1.

[2] We note that ORS 163.375, ORS 163.405, and ORS 163.427 have been amended since the charged crimes were committed, and now refer to a person's inability to consent "by reason of being mentally incapacitated, physically helpless or incapable of appraising the nature of the victim's conduct." Or Laws 2021, ch 82, §§ 4-7. References to the statutes throughout this opinion are to the versions in effect at the time of the charged crimes.

that the trial court abused its discretion in denying his motion for a mistrial. Defendant moved for a mistrial after the court received into evidence the testimony of Detective Sandler in response to the prosecutor's question whether defendant had said anything at the time of his arrest. Sandler testified:

> "No. I did place him into handcuffs, which were immediately checked for tightness and double locked, to make sure they wouldn't tighten up on him. At 1250 hours, I advised him of his rights per *Miranda*, and he told me that he had already given me a statement and he had nothing additional to say."

Defendant asserts that Sandler's response constituted a comment on his invocation of the right to remain silent and from which the jury could infer guilt. We have reviewed the record and reject the contention. Before the arrest, Sandler interviewed defendant by telephone, during which defendant had denied having had sexual relations with the victim, J, and asserted that she had made up the allegations. In light of having heard a recording of Sandler's telephone conversation with defendant, and in the context in which defendant made the statement at the time of his arrest that he had nothing additional to say, as described by Sandler in her testimony, we conclude that it is unlikely that the jury would have inferred that defendant was invoking the right to remain silent, from which it could make an inference of guilt. Additionally, we conclude that it is unlikely that the jury would have understood Sandler's testimony as a comment on the right to remain silent. We note further that the prosecutor did not highlight that testimony or even mention it. Under those circumstances, we conclude that the trial court did not err in determining that it was unlikely that the jury would infer from the testimony that defendant had invoked his right to remain silent, giving rise to an inference of guilt. *See State v. Veatch*, 223 Or App 444, 456, 196 P3d 45 (2008) ("Where the context makes such an inference unlikely, the trial court does not abuse its discretion if it denies the defendant's motion for a mistrial."). We therefore reject defendant's contention that the trial court abused its discretion in denying his motion for a mistrial. With our resolution of the fifth assignment of error, defendant's

conviction on Count 1, based on forceable compulsion, is affirmed.

Defendant's remaining assignments of error challenge the trial court's denial of his MJOA on Counts 2 through 5, based on the contention that the stated had failed to present evidence sufficient to give rise to a jury question as to whether J was unable to consent to the alleged sexual conduct initiated by defendant and from which the charges arise. In reviewing the denial of an MJOA based on the sufficiency of the evidence, we "view the evidence in the light most favorable to the state to determine whether a rational trier of fact, making reasonable inferences, could have found the essential elements of the crime proved beyond a reasonable doubt." *State v. Reed*, 339 Or 239, 243, 118 P3d 791 (2005). We summarize the evidence under that standard.

J was 28 years old at the time of trial. She was born with fetal alcohol syndrome and suffered from viral pneumonia after she was born, which resulted in scar tissue in her brain. As a result, J has an IQ of 62, and she has been determined to have an intellectual disability.[3] Although J manages her personal care such as hygiene and dressing, as a result of her disability, she needs help with many tasks of daily life—she cannot live alone, shop for herself, or manage her own transportation or finances. She requires support to integrate into the community and socialize.

J lives with her grandmother, Boothe, who has been her guardian since J was six months old. Boothe cares for J full-time, except for four weekends each year, when J attends a state-run program for people with mental disabilities. During the brief periods that Boothe arranges for respite care, J has six other caregivers who meet her needs.

J works part-time at Wal-Mart, watering plants and reorganizing and restocking clothing. For two years, a nonprofit organization provided J with a coach at work to help with transitions and navigating her job duties. As of the time of trial, J had worked two shifts without assistance. J takes a taxi to and from work so that she does not have to negotiate the bus system.

---

[3] J has been diagnosed with "mild mental retardation."

Because of J's disability, she has poor short-term memory. J gets lost easily, even around the block in her neighborhood, and she does not go anywhere alone. She has an optimistic view of people and is at a heightened risk to be taken advantage of.

Defendant attended and worked in security at the church that J attended with Boothe. Defendant started dating J after having been acquainted with her from church for approximately one year.

Before she started dating defendant, J testified, she was curious about sex and knew a little about sexual relations from watching movies.[4] She knew that a man puts his

---

[4] J explained her understanding of sexual relations on cross-examination by defendant's counsel:

"[DEFENSE COUNSEL]: So I want to ask you about some other terms to see if you know what they mean. Virginity. What does that mean to you?

"A. To me from what I was told, was that it just means that, the person has never experienced sex before another virgin, is sort of what I thought it meant.

"Q. Okay. Then do you remember where you learned that word from?

"A. It seems like my grandmother, Bobbie. She would tell me a little bit about what it would mean.

"Q. Okay. Could it be your mom?

"A. Seems like I remember it was her too. It was both of them.

"Q. It seems like from the [forensic] interview that you didn't know before what the word foreplay meant.

"A. Right. I've never—I've heard of foreplay, but I never, have never really experienced it before.

"Q. Okay, the first time you heard that word was from [defendant]?

"A. Yeah.

"Q. Okay. Do you know what foreplay means now do you think?

"A. I don't really know right now.

"Q. Okay, all right.

"A. Of what it really means.

"Q. And, going back to the term sex, do you know what the purpose is for sex?

"A. Just two people that love each other and is married that makes love, seems like what sex means to me anyway.

"Q. Okay, I don't want to put words in your mouth so it would be fair to say it's a way two people express their love?

"A. Yeah.

"Q. Okay. And, how does that make them feel when they do that?

penis into a woman's vagina and that babies are made that way. J understands that it is "the Christian way" that a person should not have sex before marriage. When asked by defense counsel if she should be able to make her own choice about whether to have sex with someone, J answered, "Yes, you know, if I'm ready and if I was married."

A jury could infer from the evidence that defendant was aware that J had intellectual deficits that made her vulnerable to manipulation. The evidence supports a finding that J's intellectual deficits are obvious after a short interaction with her. Boothe testified that before defendant and J started dating, defendant asked Boothe about J's diagnosis and that Boothe shared with him that J had been diagnosed as "retarded."

Boothe was protective of J, and when defendant asked J for a date, Boothe said that she was concerned and told J that she must bring defendant in the house before their first date. Thus, on their first date, against defendant's wishes but on Boothe's insistence, defendant came into the house to visit when he came to pick up J. Boothe shared with defendant J's navigation issues and how easily she gets lost. Defendant told Boothe that he was a Christian man and volunteered at the church. He assured Boothe that he would "take things slow" with J and would not touch her, unless they were married.

---

"A. Seems like it would make them feel they truly love each other and they're truly happy and they're truly comfortable.

"Q. Okay. What about the term coerce? Do you know that word?

"A. A—no, I've never heard that, the term course [*sic*] word before.

"Q. What about the word rape? Do you know that word?

"A. I've heard of that word. It seems like I remember when I was growing up, I didn't have a whole lot of learning process and what it really meant. It seems like it took me a little while when I was growing up on what it meant.

"Q. Okay, but you used that word yourself with Detective Sandler, right? Do you remember that?

"A. Yes.

"Q. Okay. Did you know what that word meant then?

"A. Yes.

"Q. Okay, so what does the word rape mean?

"A. It means when the victim says no, it means no and the person that's doing it to them should stop instead of continuing it."

The evidence would support a finding that defendant manipulated J and took advantage of her vulnerability. Defendant lied to J about his age, telling her that he was 30 years old when he was in fact 50. J testified that defendant asked her to marry him but also told her not to sit with him in church or to tell anyone that they were dating, because "he didn't want any of the pastors from the church know[ing] anything about what was really going on, because they would, he told me that if they knew then he, he would actu—and then they would just kick him out." Defendant told Boothe that he did not want anyone to know that he and J were dating, because he did not want anyone to think he was taking advantage of J.

J testified that defendant was controlling. Defendant told J that he liked to help homeless people and to pretend that he was Jesus and that J was Mary. J testified that she did not like that, because she said she is not Mary. J resisted defendant's suggestions that she wear high heels and a dress and not cut her hair. J testified that she also resisted defendant's requests for money and request that she stop coloring in adult coloring books. J also testified that she initially resisted defendant's attempts to know what she was texting to her cousin on her cell phone.

J participated in a forensic interview with Sandler. Sandler made a video recording of her interview with J, and the jury heard Sandler's summary of the interview and watched the video, in which J described sexual activities initiated by defendant. J also testified at trial about sexual activities that defendant initiated, and her testimony was consistent with what she had told Sandler in the interview. J testified that, on a date, defendant asked J to take off her clothes, and he helped her to undress. She thought it was strange, because no one had ever asked her to take off her clothes, but she allowed defendant to undress her because she trusted him. Defendant took photos of J when she was naked, and J said she was unhappy when defendant took pictures of her breasts and vagina, which she described as her "personal areas."

J testified that defendant watched pornography on his cell phone. One video showed a woman giving oral sex to

a man in the shower. Defendant asked J to do the same to him, and she did.[5]

J testified that defendant put his face on her vagina and licked. J backed up, but defendant pulled her back down by the legs and continued.[6]

---

[5] The prosecutor inquired, using J's terminology:

"Q. Did [defendant] ever put his, his dick in your mouth?

"A. Yes.

"Q. Can you tell me about that?

"A. He, I'm trying to remember about that one, that, that was, that was when he was actually looking up stuff on his phone, like some type of a video of this, some of it actually had this lady, and, in the shower, actually saw her have in her mouth on someone else's dick, and that was where he got an idea of putting his dick in my mouth.

"Q. So [defendant] showed you a video of a woman or lady and in that video the lady—

"A. She looked kind of young.

"Q. She looked kind of young?

"A. But I'm not sure how old that video is, and it was just something he looked up.

"* * * * *

"Q. Okay. How did that make your body feel?

"A. Actually, it actually made me felt like I was going to just gag, either gag or vomit, like that's how—

"Q. Did you get sick to your stomach?

"A. I thought I would. I should have unless I just gagged and just felt disgusted like this does not feel right and this does not feel normal.

"Q. When [defendant] put his dick in your mouth, what did it taste like?

"A. It had like a salt-type of taste, like it would, like after he was done, maybe just being done urinating or something from going to the bathroom is what it tasted like."

[6] J testified:

"Q. Did [defendant] ever put his face on your virginity area?

"A. Yeah, that's where he was, seems like I remember he was trying to like lick it with his tongue.

"Q. How did that make your body feel?

"A. It—it felt scary.

"Q. Did you try to back up a little bit, or did you try to—

"A. Yeah, I did. I did try to back up a little bit and then that was when he, seems like that was when some of the forces would get started or continue and that was when he would, because I remember he'd, he would grab me like either by my ankles or by my thighs and just pull me back down and I would try and hang on to at least to some bars or something like that from where his bed part was, but seems like I remember it was wood, too, so it wasn't much to really hang onto.

Defendant had J massage his testicles.[7]

Defendant initiated intercourse with J. J testified that, during that conduct, defendant pinned J down flat on her face. J testified that she told defendant that she was not comfortable with continuing, but defendant did not stop, and J started screaming. J testified that defendant put his hand over her mouth and told her that he did not want his roommate or the neighbors or the police to hear. J testified that she said "ow" and "no," but that defendant just repeated the words and continued. J testified that she thought that defendant had put his penis in her "behind part." She testified that she did not know about condoms or lubricant.[8]

---

"Q. Did you say anything to him when he put his mouth on your virginity area?

"A. Seems like I remem—I don't really remember for sure if I said anything to him about that part, it's just I remember I didn't, I didn't like it, and it didn't feel right. I did not felt (sic) right. It did not felt (sic) normal at all."

[7] J testified:

"Q. [J], did [defendant] ever have you touch or massage his balls?

"A. Yeah.

"Q. Can you tell me about that?

"A. He, that was when he was on top of me. Back then I was actually flat on my back when that, when that part occurred, and seems like I remembered was he would use the same thing that he used kind of a little bit was, that's kind of where those sort of like jelly-type of things, whatever it's called, would occur, and that's where he would make me, he would have me do that and he would have, he would actually put that stuff on my hands and have me do that type of thing.

"Q. And when [defendant] had you touch or massage his balls, how did that make you feel?

"A. It felt, it felt uncomfortable.

"Q. Did he, did he tell you why he wanted you to massage his balls?

"A. Well, in his defense on that part, he, to him, it felt good.

"Q. So because it felt good to him?

"A. Yeah, it was like a, yeah, yeah, it was like a massage."

[8] The prosecutor inquired, again using J's terminology:

"Q. And did you ever see [defendant] put anything on his dick?

"A. Yeah, and I never could figure out what the, what it was called, but it was kind of like just like thick types of clear type of thing and around that time he would use that before he forced his dick into my virginity, because that was his way to try and force, force it in there, because it's bigger, and I remember when I would come home or if I was still at his place and I had to use the restroom, when I would urinate, I would actually urinate that stuff out."

In his first through fourth assignments, defendant asserts that the trial court erred in denying his motion for a judgment of acquittal on the offenses alleged in Counts 2 through 5, based on a lack of evidence of J's inability to consent to sexual activity due to her mental disability. As relevant to the charged crimes, under ORS 163.315(1)(a) (2015), *amended by* Oregon Laws 2021, chapter 82, section 2, a person is "incapable of consenting to a sexual act" if the person is "mentally defective."[9] ORS 163.305(3) (2015), *amended by* Oregon Laws 2021, chapter 82, section 1, provided that a person is "mentally defective" if the person "suffers from a qualifying mental disorder that renders the person incapable of appraising the nature of the conduct of the person."[10]

Defendant does not dispute that J suffers from a mental disability—a qualifying "mental defect" under the terms of the statute. But he contends that her mental defect did not preclude her from being able to consent to sexual activity. Defendant points out, for example, that J's disability did not prevent her from expressing her desires or resisting some of defendant's demands, such as those relating to her dress, her hair, her money, or her coloring. J clearly had the ability to refuse to do things that defendant asked her to do. Defendant contends that the evidence fails to show that she was unable to consent to sexual activity initiated by defendant because her mental defect rendered her incapable of appraising the nature of the sexual conduct.

In *Reed*, the court determined the common meanings of the terms "incapable" and "appraise." 339 Or at 244 (citing *Webster's Third New Int'l Dictionary* 105, 1141 (unabridged ed 2002)). Based on the dictionary definitions of those terms, the court stated:

---

[9]  As noted, 321 Or App at 706 n 1, the statutes defining the offenses were amended in 2021 to omit the phrases "by reason of mental defects" and "by reason of mentally defective" and to substitute "by reason of being mentally incapacitated, physically helpless or incapable of appraising the nature of the victim's conduct." ORS 163.315 was also amended by Oregon Laws 2021, chapter 82, section 2, and now provides that a person is incapable of consenting to a sexual act if the person is "incapable of appraising the nature of the person's conduct."

[10]  ORS 163.305 was amended by Oregon Laws 2021, chapter 82, section 1 to omit the definition of "mentally defective" and now provides that a person is "mentally incapacitated" if the "person is rendered incapable of appraising or controlling the conduct of the person at the time of the alleged offense."

"ORS 163.305(3) refers to a mental defect that prevents one from appraising the nature of one's own conduct. *The 'appraisal' must constitute an exercise of judgment and the making of choices based on an understanding of the nature of one's own conduct.* Further, in circumstances such as those presented in this case, we view that standard in the context of interactions with other persons, such as offers and proposals from other persons to engage in certain kinds of conduct."

339 Or at 244 (emphasis added). The court held in *Reed* that the trial court erred in denying the defendant's MJOA on the sexual crimes charged there based on the victim's inability to consent, explaining that the evidence presented failed to link the victim's mental condition to an inability to consent to sexual contact:

"On this record, we conclude that the state's evidence did not support the trial court's decision to deny defendant's motion for a judgment of acquittal. [The expert witness] never was asked directly whether the victim's mental condition rendered her incapable of consenting to sexual contact. [The expert witness]'s testimony did not address either directly or inferentially the element of 'incapable of consent' due to 'mental defect' in the sex crimes at issue, as we have construed that element in this opinion. Indeed, at oral argument in this court, the state conceded that it had offered no direct evidence at trial regarding how the victim's mental capacity had affected her ability to appraise the nature of the sexual conduct that defendant had initiated. As noted, [the expert witness] testified that the victim was not socially independent in her daily affairs and had difficulty maintaining a job. Although that testimony might have had some bearing on the victim's qualifications to manage money or to participate in the work force, it failed to describe, either directly or by permissible inference, her ability to understand and to consent to sexual relations."

*Id.* at 247. Under the standard announced in *Reed*, the evidence in the record must link the victim's inability to understand and consent to sexual relations to the victim's mental disability.

In *State v. Tilly*, 269 Or App 665, 681, 346 P3d 567, *rev den*, 357 Or 640 (2015), we explained that the holding in *Reed* requires more "than generalized proof of

mental disability." Rather, the state must establish "the complainant's requisite, particularized inability to understand or consent to sexual relations."

Thus, our case law has explained that the ability to consent consists of two related concepts: (1) understanding the nature of sexual conduct and (2) exercising judgment and making choices based on that understanding. *Reed*, 339 Or at 244. Here it was the state's burden to prove that, because of her mental disability, J lacked the "particularized ability" to understand the nature of the conduct that defendant initiated, *i.e.*, to understand that it was sexual, or to exercise judgment to make the choice to consent to it. *Id.*; *Tilly*, 269 Or App at 681.

The state contends that the evidence of J's vulnerability and lack of understanding of sexual relations,[11] as well as her passive acquiescence to defendant's conduct that she found unpleasant, met that burden. But as defendant contends, J's lack of knowledge about what constitutes sexual activity does not necessarily equate with an inability to consent. The court explained in *Reed* that a mental disability does not necessarily preclude a person from being able to consent to sexual activity:

> "It is also necessary to point out that the statutory definition of mentally defective does not support the notion that a person who has a mental disability is necessarily incapable of consenting to sexual relations under any circumstances. Rather, *a person who can understand that another person has initiated some kind of sexual activity with that person may be capable of appraising the nature of the conduct and, thus, may be capable of consenting to a sexual act for purposes of the statutory provisions at issue here*."

339 Or at 245 (emphasis added). It is clear that J had a limited and simplistic understanding of what sexual activity

---

[11] The state does not contend that J's mental defect would prevent her from *ever* being able to consent. In fact, the state conceded at oral argument the possibility that J could, with help, become sufficiently knowledgeable about sexual activity to give consent. That concession would seem to be inconsistent with the state's burden to show that, because of her mental disability, J lacked the "particularized ability" to appraise the nature of sexual conduct or to exercise judgment to consent to it. But because of our disposition, we do not need to decide here whether, to convict a person based on an inability to consent, the state must establish that the person's mental disability will always prevent the person from being able to consent.

was. Because of defendant's manipulations and misrepresentations, she may not even have understood that the activity that defendant initiated with her was "sex" and not "foreplay."[12] But although J might not have understood that

---

[12] We include the following excerpts of Sandler's forensic interview of J to illustrate J's simplistic understanding of sexual activity:

"MS. SANDLER: So what I'd like you to do is tell me all about what happened with [defendant] that led this officer to believe that this was a sex abuse case. Can you tell me everything you'd done with [defendant]?

"[J]: Well, he would have me—when he would take me to his house, that's where he would call foreplay.

"MS. SANDLER: Okay.

"[J]: Which I had never heard of before.

"MS. SANDLER: What is foreplay?

"[J.]: Well, I thought they just called it foreplay—how I pictured it would just be, you know, people that truly love each other—

"MS. SANDLER: Um-hum.

"[J]: —and when they're ready to like have, you know, just, you know, (indiscernible) or just be close—

"MS. SANDLER: Um-hum.

"[J]: —together. That's what I thought it would be, but the way [defendant] did it, he would just like—one time he would just take me down in his bedroom.

"MS. SANDLER: So tell me about the time you could be there in his bedroom.

"[J]: It was the day before his birthday.

"[J]: Okay. And what happened?

"[J]: He like had me take off his—had me take off my clothes, and then—

"MS. SANDLER: Um-hum.

"[J]: —that is when he would end up taking pictures of me nude.

"MS. SANDLER: Okay.

"[J]: When I got out of the shower, he does the same thing through text, just through text. He ended up taking pictures of me nude then, too.

"MS. SANDLER: Okay. So let's go back to the day before his birthday. You said that he took you down into his bedroom. So first, he had you take off your clothes, and then what happened next?

"[J]: That is when he would like start with the pinning me down type of thing, and then—

"MS. SANDLER: So what was that—

"[J]: —put his dick—his dick in me.

"MS. SANDLER: Okay. All right. So when you said he put his dick in you, where did he put his dick? Where does his dick go?

"[J]: (Indiscernible). It was kind like around my—it was around my face, which would be kind of like where the—like the (indiscernible) would be.

"MS. SANDLER: Okay.

defendant's conduct toward her was "sex," *per se*, *i.e.*, she lacked a precise understanding of the details or terminology of "sex," the evidence does not support the finding that J did not understand that the activity initiated by defendant was sexual in nature. J testified that defendant told her that putting his penis in her mouth was "part of sex." J told Sandler that she did not know anything about sex but that she "really wanted to know what it was like." When Sandler asked J if she was "okay" with her clothes coming off, J responded, "Yes and no." The record requires the finding that J understood that defendant had initiated sexual activity with her.

Although the evidence supports a finding that, in initiating sexual activity, defendant took advantage of J's curiosity, as well as her vulnerability and lack of understanding, here, as in *Reed*, there is no evidence that J's mental disability prevented her from understanding the sexual nature of the conduct that defendant initiated. Nor would the evidence support a finding that, because of her mental disability, J lacked the ability to exercise judgment to consent to sexual conduct.[13] In the absence of that evidence, we must conclude that the record does not support a finding that, because of her mental disability, J lacked the ability to consent. We conclude, therefore, that the trial court erred in denying defendant's motion for a judgment of acquittal on Counts 2 through 5.[14]

---

"[J]: And after that (indiscernible). One time when I went to the bathroom at home not too long ago, I actually did like (indiscernible). I remember when I went to go to the bathroom and I got in the shower and I'd touch that area and there would be times where it would kind of like slimy.

"MS. SANDLER: Okay.

"[J]: Which would be from where he put his dick at.

"MS. SANDLER: Okay.

"[J]: And he told me about—had said something about that being normal. It didn't seem normal to me, having that—"

[13] The state's theory at trial was that J's mental disability made her unable to consent to sexual activity; thus, we are not presented with the question whether J did not *in fact* consent to sexual activity when her reluctant acquiescence is considered in light of her mental disability and defendant's manipulative behavior.

[14] In view of our reversal of the guilty verdict on Count 2 and defendant's convictions on Counts 3 through 5, we need not address defendant's sixth and seventh assignments of error, in which he challenges, under *Ramos v. Louisiana*, 590 US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020), the trial court's giving of a nonunanimous jury instruction and his conviction of sexual abuse in the first degree (Count 5) based on a nonunanimous verdict.

Counts 2 through 5 reversed; remanded for resentencing; otherwise affirmed.

**MOONEY, P. J.,** concurring in part, dissenting in part.

I join the majority and concur in rejecting the arguments raised by defendant in his *pro se* supplemental brief and in affirming the judgment of conviction on Count 1, rape in the first degree based on forcible compulsion. But because I view the record pertaining to Counts 2, 3, 4, and 5 differently than the majority, and because I would affirm those convictions as well, I must respectfully dissent in part.

The legal standard in reviewing the denial of a motion for judgment of acquittal requires us to view the facts and reasonable inferences in the light most favorable to the state. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). It is our job to affirm the convictions when the evidence is legally sufficient to support the jury's verdict. *Id.*

The pertinent, undisputed evidence is this:

- J is an adult woman who suffers from a mental disability—a qualifying "mental defect" under the terms of *former* ORS 163.305(3) (2015).

- J is intellectually disabled with an IQ of 62, and she has been diagnosed with mild retardation.

- J requires assistance with basic activities of daily living—to the point that she requires a full-time caregiver, every day of the year.

- J works at Wal-Mart where, after two years of coaching, she waters plants and helps to organize clothing.

- J has poor short-term memory and cannot successfully navigate her own neighborhood; she requires a pre-arranged taxi to get to and from Wal-Mart.

- J has a vague understanding of what sex is and where babies come from, and she has expressed some interest in learning about sex.

- When defendant asked J to change her hairstyle and her manner of dress, she resisted those requests.

- When defendant asked J to remove her clothing, she did so reluctantly and only because she trusted defendant, but his physical advances were scary, uncomfortable, and made her gag; when J tried to pull away from defendant, he stopped her and continued what he was doing.

A rational jury, drawing on its common knowledge about intellectual capacity in humans and what that looks like in terms of how a person functions in the world could rationally conclude that J's qualifying mental disorder rendered her unable to consent to sexual contact with defendant under the circumstances of this case. No one would suggest that a third-grade child of average intelligence, who functions scholastically at the same level as an adult with an IQ of 62, would have the capacity to consent to sex. It would not matter that the child knew something about sex or even that the child was interested in learning about sex. And it would not matter that the child had resisted haircuts or refused to wear certain clothing items. We presume that children do not have sufficiently-developed adaptive skills or the judgment necessary to negotiate the complex dynamics of a sexual relationship—no matter how smart the child may be. Intelligence in the academic or scholastic sense is only part of the picture.

Here, the jurors knew that J's IQ was 62 and that she had been diagnosed with mild mental retardation. In fact, they knew that J's mental disability was a "mental defect" under the first-degree rape statute—a point defendant did not dispute. To be sure, they also knew that J was an adult—not a child in third grade. But while mental retardation begins in childhood, it survives childhood and continues into adulthood. Given that the jurors had evidence of J's compromised intellectual capacity, mild mental retardation diagnosis, as well as testimony bearing on J's limited adaptive skills, they could logically conclude *on this record*, that because of her mental disability, she was not able to consent to sex with defendant.